IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| MICHELLE CARTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 3:18-cv-807 _____ |
| | ) | |
| CAROL B. CARTER, Ed.D. | ) | |
| Serve: 242 Allen's Circle | ) | |
| King & Queen Court House, VA 23085 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KING & QUEEN COUNTY SCHOOL BOARD | ) | |
| d/b/a King & Queen County Public Schools | ) | |
| Serve: Ms. Harwood Hall, Chair | ) | |
| 588 Waterfence Road | ) | |
| Mattaponi, VA 23110 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Michelle Carter ("Ms. Carter" or "Plaintiff"), by counsel, states as follows for her Complaint against defendants Carol B. Carter, Ed.D. ("Dr. Carter"), who is sued in both her official and her individual capacities, and the King & Queen County School Board d/b/a King & Queen County Public Schools ("K&Q" or "School System").

### NATURE OF ACTION

1. This is an action for defamation, tortious interference, and violations of due process rights (both substantive and procedural rights) under the Fifth and Fourteenth Amendments to the U.S. Constitution. In a nutshell, Dr. Carter, individually and in her capacity as the Superintendent of the School System, affirmatively disseminated false and defamatory information about Ms. Carter, a former K&Q employee, when she applied for an administrative assistant's job with the Williamsburg James City County School System

1

("WJCCSS").  In particular, Dr. Carter falsely told WJCCSS that Ms. Carter was fired from K&Q (in truth, she resigned) and also falsely said, through the improper dissemination of numerous documents from Ms. Carter's confidential K&Q personnel file, that Ms. Carter was terminated for insubordination, gross disregard of her supervisor's request, failing to report for work without notice, and generalized poor performance. In doing so, Dr. Carter violated the confidentiality provisions of K&Q handbook, as well as the clear language of the Virginia Freedom of Information Act. Even worse, Dr. Carter *knew* that she was disseminating false information because she was privy to the true details about Ms. Carter's prior employment at K&Q because she had had several specific discussions with her about it. Indeed, Dr. Carter is Ms. Carter's step-mother-in-law. As a result of the dissemination of such false and defamatory information, WJCC revoked the job offer it had just made to Ms. Carter and believed she was a liar. Ms. Carter also suffered, and is still suffering, substantial economic and emotional damages. As explained herein, this conduct violates state and federal law and Michelle Carter now files this lawsuit to hold the defendants liable for their unlawful actions.

## PARTIES

2.      Michelle Carter is an individual resident of Mattaponi, Virginia. At all relevant times herein, Ms. Carter is, and has been, Dr. Carter's step-daughter-in-law.

3.      Defendant Carol B. Carter, Ed.D., upon information and belief, is a Virginia resident. At all relevant times herein, Dr. Carter is, and has been, the Superintendent of the School System. In this capacity, she is the CEO of the School System and has the ability to, and often does, act for, and on behalf of, the School System.  At all relevant times, Dr. Carter also, is and has been, Ms. Carter's step-mother-in-law.

2

4.      Defendant School Board is a corporate entity with authority to sue and be sued under Virginia law.  See Va. Code § 22.1-71.

### JURISDICTION AND VENUE

5.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Pendent and supplemental jurisdiction of the common law counts (Count II and III) is conferred pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claim occurred.

### FACTUAL BACKGROUND

7.      On May 2, 2018, Ms. Carter applied on-line for an administrative assistant's position with WJCCSS. In her application, she said (i) that she had worked for K&Q from September 2008 through February 2014 as an "Accounts Payable Clerk"; (ii) that she left that position "[t]o be a stay at home mom"; and (iii) that WJCCSS could contact the School System about her prior employment.

8.      On May 14, 2018, Ms. Carter interviewed for the job on-site with WJCCSS.

9.      The very next day, May 15, 2018, WJCCSS called Ms. Carter and offered her the administrative assistant's position.  She accepted.

10.      On May 18, 2018, Ms. Carter then came to the WJCCSS main office to complete her criminal background check paperwork, which came back clear.

11.      A few days later, on May 22, 2018, Ms. Carter completed her TB testing for the WJCCSS position.

12.      Finally, on Friday, May, 25, 2018, Ms. Carter returned to the WJCCSS main office and completed her final paperwork.  At that time, WJCCSS gave Ms. Carter a formal

"Letter of Appointment," which she executed on site, and a WJCCSS photo-ID badge.  In relevant part, the appointment letter said that (i) Ms. Carter would be employed as an "Administrative Assistant/Data Analyst"; (ii) her employment would begin on June 4, 2018; and (iii) her salary would be $2,720 a month (or roughly $32,000 a year).

13.     On that same date, WJCCSS set up an official personnel file for Ms. Carter.

14.     A few days later, on May 29, 2018, Ms. Carter's husband was having lunch with his father (Dr. Carter's husband) and told him that Ms. Carter had just gotten a new job with the WJCCSS.  Upon information and belief, Mr. Carter relayed this information about Ms. Carter to Dr. Carter later that same day.

15.     The very next day, on May 30, 2018, upon information and belief, Dr. Carter reached out to the WJCCSS Superintendent (someone she knew) to speak to her about Ms. Carter. Tim Baker, WJCCSS's Senior Director for Talent Management and Organizational Development, followed up Dr. Carter's inquiry, e-mailed her, and asked her to call him to discuss Ms. Carter.

16.     Upon information and belief, later that day, Dr. Carter returned Mr. Baker's call, spoke with him, and falsely told him that Ms. Carter had been previously terminated by K&Q and that the basis for the termination was insubordination.

17.     Dr. Carter also followed up the call that afternoon by sending Mr. Baker an e-mail that said: "FYI."  Attached to that e-mail were three items: (i) a January 21, 2014 letter or reprimand from Dr. Stanley Jones (the predecessor Superintendent to Dr. Carter) to Ms. Carter; (ii) a January 31, 2014 letter from Dr. Jones to Ms. Carter, and (iii) a January 21, 2014 "Performance Improvement Plan" for Ms. Carter from Dr. Jones.  All three items are attached and labeled respectively as **Exhibits A**, **B**, and **C**.

4

18.     The January 21, 2014 letter was Dr. Jones' overreaction to a dispute between Ms. Carter and her then-boss, Ms. Harwood Hall. Importantly, it falsely accused Ms. Carter of "insubordination" and falsely said that she had exhibited a "gross disregard" for the reasonable request of her supervisor. **Exhibit A**, p. 1.  In truth, Ms. Carter and Ms. Hall had had a reasonable and legitimate disagreement about which one of them was responsible for handling certain work tasks.  In no way was Ms. Carter insubordinate to Ms. Hall, and in no way did she exhibit a "gross "disregard" of her supervisor's instructions.

19.     The January 31, 2014 was letter was an even more exaggerated document. For starters, it repeated Dr. Jones' false accusation of "insubordination" – again omitting the full context of the disagreement between Ms. Carter and her supervisor. **Exhibit B**, p. 1. It also falsely stated that Ms. Carter had "failed to report to work" on January 28 and 31, 2014 and had failed to "contact the office by phone, text or e-mail to indicate" that she would be absent, falsely implying that no one knew where she was and that she was "AWOL." *Id.* In truth, on both of the days in question, Ms. Carter was on medical leave – leave that was documented by a doctor's note, *approved* by Ms. Carter's supervisor, and *known* to, at a minimum, the Clerk of the K&Q School Board.  In other words, Ms. Carter was not somehow "playing hooky" from work on those days.  Finally, it recommended termination, which in the context in which it was disseminated to WJCCSS, falsely indicated that K&Q terminated Ms. Carter for the reasons stated in the letter.

20.     Third and finally was the Performance Improvement Plan.  This Plan falsely repeated the insubordination allegation and disparaged Ms. Carter by impugning her judgment, her willingness to work, and her attitude.  The document was signed by Dr. Jones, and Ms. Hall, *but **not** Ms. Carter. Also of note, the document specifically said on its face that "the contents of this PIP are to remain confidential."

21.    In short, all three documents falsely stated that Ms. Carter was insubordinate to her supervisor and falsely portrayed her in a negative light.  All three documents were kept in Ms. Carter's formal confidential K&Q personnel file, and at no time did Dr. Carter contact Ms. Carter to let her know that she was disclosing them.

22.    Later on in that same day (May 30, 2018) and soon after he had spoken with Dr. Carter, Mr. Baker called Ms. Carter and told her that WJCCSS was revoking its offer of employment.  It was doing so, he said, because she had lied on her WJCCSS application by not truthfully telling WJCCSS that she had been fired from K&Q.  Ms. Carter disputed this false accusation, but Mr. Baker defiantly said that there was nothing she could say that would make any difference.  Ms. Carter hung up the telephone and burst into tears.

23.    Dr. Carter, however, did not stop with her dissemination of false documents. Instead, the very next day, May 31, 2018, Dr. Carter doubled-down on her false allegations against Ms. Carter and disclosed more false documents about Ms. Carter. Specifically, attaching two additional documents, she e-mailed Mr. Baker and said: "Hello.  I found this and thought it might help.  Thank you, Carol."  The two attached documents were an internal K&Q personnel form titled "King and Queen Personnel Action/Change Form" and a document titled "Employee Exit Interview Meeting."  *See, e.g.,* **Exhibit D**.

24.    Both documents purported to show that K&Q had involuntarily terminated/ dismissed Ms. Carter back in 2014. Indeed, on the "Personnel Action/Change Form" document, there is a specific line across from, and corresponding to, the word "Resignation" where a check mark is supposed to be placed if the employee at issue has resigned.  The line on Ms. Carter's form, however, was not checked.

25.    As with the earlier documents, both of these additional documents were kept in Ms. Carter's formal confidential K&Q personnel file, and, as before, at no time did Dr.

6

Carter contact Ms. Carter to let her know that she was disclosing them.

26.    These documents, however, were false on the issue of termination.  The truth is that on February 3, 2014, Ms. Carter e-mailed the K&Q HR Director, Ms. Janella Temple, and told her that she was resigning effective that date.  The subject line of her e-mail was "Resignation."  And ***at no time*** did K&Q *terminate* Ms. Carter.

27.    Dr. Carter *knew* that the statements she communicated about Ms. Carter – both in her verbal statements and the statements in the documents she disclosed – were false.  Most notably, after Ms. Carter had resigned, Dr. Carter and Ms. Carter spoke many times about her prior K&Q employment; in more than one of those conversations, Ms. Carter ***told Dr. Carter*** that she had resigned from the K&Q job.  Indeed, Dr. Carter, who was a school principal for K&Q back in 2014 and who had witnessed many rants and verbal outbursts by Dr. Jones (the then-Superintendent), had candidly told Ms. Carter – also more than once -- that, based on Dr. Jones' intimidating and threatening conduct, she fully understood why Ms. Carter had "quit."

28.    Dr. Carter's false disclosures also violated K&Q's own personnel policies.  Specifically, Section G of the K&Q School Board Policy Manual, under the heading "Personnel Records," states:

> If information relative to employment is requested by banks or ***other establishments or individuals***, ***written permission*** from the employee to release such information is ***required***, except to comply with a judicial order, a lawfully issued subpoena, the Virginia Freedom of Information Act . . . or other law or court order.  ***The employee will be notified of the request for records***.

**Exhibit E** (emphasis added).  Here, Ms. Carter provided no written permission to Dr. Carter or anyone else that would have allowed Dr. Carter or K&Q to release her personnel records to anyone.  And Ms. Carter was never notified of the disclosure of her records.

7

29.     Finally, Dr. Carter's actions were inconsistent with the Virginia Freedom of Information Act.  Specifically, **unless** an employee waives his or her protections under the Act, it provides an express **exemption** from disclosure of:

> Personnel information concerning identifiable individuals, except that access shall not be denied to the person who is the subject thereof.

It then states that:

> Any person who is the subject of such information and who is 18 years of age or older may waive, **in writing**, the protections afforded by this subdivision. **If the protections are so waived, such information shall be disclosed.**

Va. Code § 2.2-3705.1(1) (emphasis added). Here, Ms. Carter did nothing to waive her protections under the Act with respect to her K&Q personnel file.

30.     After WJCCSS revoked Ms. Carter's job offer, she called Dr. Carter and asked her to make things right – in particular, she asked her to clarify that Ms. Carter had **not been terminated** by K&Q.  At that time, she believed that Dr. Carter had been in contact with WJCCSS, but she did not learn until later on just how much false and defamatory information Dr. Carter had disclosed about her.  Dr. Carter refused to follow up with WJCCSS and told her that she "did not want to get involved."

31.     Dr. Carter's false statements and improper disclosures regarding Ms. Carter are not isolated actions. Instead, they are part of a much larger pattern of vindictiveness by Dr. Carter against former K&Q employees. Besides Ms. Carter, for example, Dr. Carter has repeatedly wrongfully disparaged several former employees of K&Q, such as Suzanne Gilbertson, and has done so with impunity. Within the last year alone, she has repeatedly taken the floor at School Board meetings and publicly disparaged and defamed Ms. Gilbertson by contrasting her allegedly poor performance as a K&Q employee with the allegedly good performance of the person who currently holds Ms. Gilbertson's former

position.  She has also engaged in such behavior with the knowledge of current School Board members.

32.    Since the wrongful revocation of her job offer from WJCCSS, Ms. Carter has been unable to find any comparable full-time position in her local area.  She has also suffered substantial emotional damages.

**COUNT I:**
**DUE PROCESS VIOLATION: LIBERTY INTEREST**
**(AGAINST DEFENDANTS CAROL B. CARTER, ED.D. AND K&Q)**

33.    The allegations of paragraphs 1-33 are realleged as if fully set forth herein.

34.    Under the Fourteenth Amendment, Ms. Carter has a liberty interest to engage in the commonplace occupations of her life and with respect to her good name, reputation, honor, and integrity.

35.    Here, defendant Dr. Carter, as an agent of a governmental entity and acting under color of state law, and K&Q violated Ms. Carter's liberty interests by falsely stating that she was terminated and falsely stated that she was terminated for things such as insubordination (which she did not commit) and missing time from work without giving notice (which was not true), as explained in paragraphs 16, and 18 through 21.

36.    K&Q's actions were the result of Dr. Carter's actions as a de facto policy-maker at K&Q and as the result of her de facto policy and custom of bad-mouthing former K&Q employees.

37.    These false accusations impugn Ms. Carter's good name, honor, reputation, and integrity, thus causing a stigma to her reputation, and were used directly as the basis to deprive Ms. Carter of a government job, namely the job she had just been offered by WJCCSS.

9

38.    Additionally, the false statements at issue were made public to, among others, Tim Baker.

39.    As a direct result of defendants' actions at issue, in violation of the rights secured to Ms. Carter under Section 1983, Ms. Carter has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Ms. Carter has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

40.    Further, Dr. Carter's actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Ms. Carter's rights, thus entitling her to punitive damages from Dr. Carter.

### COUNT II -- DEFAMATION
### (AGAINST DR. CAROL B. CARTER)

41.    The allegations of paragraphs 1-40 are realleged as if fully set forth herein.

42.    Ms. Carter has been defamed by the statements made and disseminated by Dr. Carter that are specifically referenced and set forth herein (specifically those identified in paragraphs 16, 18-21, 13, and 44 herein), which statements were published and were made with the intent to defame Ms. Carter.

43.    The statements at issue are false and purport to be statements of fact, not statements of opinion.

44.    Moreover, the false statements all involve Dr. Carter's efforts to demean and disparage Ms. Carter and to falsely accuse her of unprofessional occupational activities and unfitness to perform the duties of her job, and thus these statements constitute defamation *per se.*

45.     As a proximate cause of Dr. Carter's conduct, Ms. Carter has suffered substantial compensatory damages, including as severe mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.

46.     In addition, the statements by Dr. Carter were made intentionally, willfully, and maliciously against Ms. Carter and with utter and conscious disregard of her rights.

47.     Finally, as a result of no privileges attach to these statements, therefore, and Ms. Carter is also entitled to punitive damages in this matter.

### COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT/EXPECTANCY
### (AGAINST DR. CAROL B. CARTER)

48.     The allegations of paragraphs 1-48 are realleged as if fully set forth herein.

49.     As explained herein, Ms. Carter had a valid employment contract/ expectancy with WJCCSS by virtue of her fully executed "Letter of Appointment" with WJCCSS.  Indeed, the letter set forth Ms. Carter's title, her salary, and the start date for her employment.

50.     Dr. Carter was and at all times has been fully aware of Ms. Carter's contractual relationships/expectancies.

51.     Dr. Carter intentionally interfered with Ms. Carter's contractual relationships/expectancies.

52.     Dr. Carter used improper means and methods, particularly defamation and sharp practices, to interfere with Ms. Carter's contractual relationships/expectancies.

53.     As a proximate cause of Dr. Carter's tortious interference, Ms. Carter has suffered compensatory damages, including the loss of her job offer from WJCCSS.

11

54.     In addition, Dr. Carter's actions were made intentionally, willfully, and maliciously against Ms. Carter and with utter and conscious disregard of her rights.  Ms. Carter therefore is entitled to punitive damages in this matter.

**COUNT IV:**
**DUE PROCESS VIOLATION: SUBSTANTIVE DUE PROCESS**
**(AGAINST DEFENDANTS CAROL B. CARTER, ED.D. AND K&Q)**

55.     The allegations of paragraphs 54 are realleged as if fully set forth herein.

56.     Under the Fourteenth Amendment, Ms. Carter has a liberty interest to engage in the commonplace occupations of her life and with respect to her good name, reputation, honor, and integrity.

57.     Here, defendant Dr. Carter, as an agent of a governmental entity and acting under color of state law, and K&Q violated Ms. Carter's liberty interests by (i) violating a fundamental right to her privacy in her confidential personnel file information; and (ii) disclosing her private confidential personnel file information, in violation of both the K&Q policy manual and the Virginia Freedom of Information Act, in a manner that is so egregious as to shock the conscience and/or offend a sense of justice.  As to the latter point, Dr. Carter's actions were intentional, willful, malicious, and at a minimum, committed with deliberate indifference to Ms. Carter's rights.

58.     K&Q's actions were the result of Dr. Carter's actions as a de facto policy-maker at K&Q and as the result of her de facto policy and custom of bad-mouthing former K&Q employees.

59.     These false accusations impugn Ms. Carter's good name, honor, reputation, and integrity, thus causing a stigma to her reputation, and were used directly as the basis to deprive Ms. Carter of a government job, namely the job she had just been offered by WJCCSS.

60. Additionally, the false statements at issue were made public to, among others, Tim Baker.

61. As a direct result of defendants' actions at issue, in violation of the rights secured to Ms. Carter under Section 1983, Ms. Carter has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Ms. Carter has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

62. Further, Dr. Carter's actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Ms. Carter's rights, thus entitling her to punitive damages from Dr. Carter.

WHEREFORE, Michelle Carter respectfully and specifically requests the following relief against Defendants:

> (a) Compensatory and presumed damages against Dr. Carter in the amount of one million dollars ($1,000,000), or some amount as may be determined at trial, to compensate Ms. Carter for all of the damages associated with Dr. Carter's defamation of her;

> (b) Compensatory and presumed damages in the amount of one million dollars ($1,000,000), or some amount as may be determined at trial, to compensate Ms. Carter for all of the reputational damages associated with the defendants' violation of her Constitutional due process rights and liberty interests;

> (c) Compensatory and lost past and future wage damages in the amount of five hundred thousand dollars ($500,000), or some amount as

may be determined at trial, to compensate Ms. Carter for all of her losses, including lost wages and emotional damages, associated with Dr. Carter's tortious interference;

(d)  Punitive damages against Dr. Carter in the amount of three hundred fifty thousand dollars ($350,000) dollars;

(e)  As to Counts I and IV, attorney's fees;

(f)  Pre-judgment interest; and

(g)  Associated expenses and costs related to this action and all other such relief as is just and proper.

**A TRIAL BY JURY IS DEMANDED**.

MICHELLE CARTER

By:  s/ Richard F. Hawkins, III
Virginia Bar Number: 40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
Email: rhawkins@thehawkinslawfirm.net

Counsel for Plaintiff

14